IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| -vs- ) | Case No. CR-19-372-F |
| ) | |
| MARIO JAQUES, ) | |
| a/k/a Menace Deuce, ) | |
| ) | |
| Defendant. ) | |

## ORDER

Before the court is the Motion to Suppress Evidence Obtained from Wiretap on TT1 (and any Other Wiretap on Which Defendant was Intercepted), filed by defendant, Mario Jaques. Doc. no. 418. Plaintiff, United States of America, opposes the motion. Doc. no. 447. Having reviewed the parties' submissions and considered the parties' oral arguments, the court finds that defendant's motion should be denied.

I.

Defendant seeks to suppress evidence derived from a Title III[1] wiretap conducted on what is referred to as TT1. TT1 was an AT&T wireless cellular telephone used by Ramon Dominquez, an inmate in the Oklahoma State Penitentiary, to conduct drug business. It had an assigned number of 405-906-8141. Defendant was identified as a "Target Subject" in the affidavit of the special agent of the Federal Bureau of Investigation ("FBI") submitted in support of the wiretap

---

[1] Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III or Federal Wiretap Act"), 18 U.S.C. § 2510, *et seq*. Title III "generally forbids the intentional interception of wire communications, such as telephone calls, when done without court-ordered authorization." United States v. Faulkner, 439 F.3d 1221, 1223 (10th Cir. 2006).

application.  An order authorizing the interception of wire and electronic communications for TT1 was issued by the Honorable David L. Russell on March 1, 2019.  There were other Title III wiretap orders, but no issues as to those orders are before the court.

As support for his motion, defendant argues that the FBI special agent's affidavit failed to establish sufficient "necessity" under 18 U.S.C. § 2518(1)(c) for the wiretap.  Defendant contends that the affidavit showed that traditional investigatory techniques were working and uncovering considerable evidence.  As to any traditional investigatory techniques not tried, defendant asserts that the affidavit contained only boilerplate and conclusory statements as to why the methods had not been tried or as to why they would supposedly fail.  Defendant maintains that this was true of the affidavits in support of the other Title III wiretaps.  Because the affidavits showed that traditional investigatory methods were productive, defendant posits that the wiretaps were not necessary.  Consequently, defendant argues that the evidence obtained through the Title III wiretaps should be suppressed.

Initially, plaintiff responds that the court need not reach the Title III claim.  Plaintiff maintains that a court order was not required to intercept the calls because the phone in question–TT1–was a contraband cell phone possessed by Mr. Dominquez in the Oklahoma State Penitentiary.  Plaintiff points out that the Federal Wiretap Act includes an explicit exception to the prohibition of intercepting telephone calls where parties to the communications have given prior consent.  It asserts that consent can be express or implied and that courts have recognized implied consent in circumstances involving contraband cell phones.  According to plaintiff, Mr. Dominquez impliedly consented to the interception of his calls because he was aware that his calls were subject to monitoring by prison officials.  Plaintiff states that all state prisoners, like Mr. Dominquez, are informed and warned by the

Oklahoma Department of Corrections that their calls may be monitored. In light of that information and warning, and Mr. Dominquez's decision to proceed with making and receiving calls on the contraband cell phone, plaintiff contends that the court may find that Mr. Dominquez impliedly consented to the interception of the calls of TT1.

Plaintiff additionally argues that the court should find that contraband cell phones are implicitly excepted from the scope of Title III. According to plaintiff, Title III's purpose is to protect the privacy of wire and oral communications. However, it points out that prisoners, under case law, do not have a reasonable expectation of privacy in communications with those outside of prison. Moreover, possession of contraband cell phones constitutes a violation of federal and state law. Given the diminished interest in privacy in prisons and the prohibition on the possession of cell phones, plaintiff contends that the inclusion of conversations involving contraband cell phones within the scope of Title III would run counter to Title III's policy goals. Plaintiff maintains that it was not required to obtain a Title III wiretap order for TT1, and therefore, any alleged failure to show the necessity in the wiretap application does not require suppression.

Even if the Title III claim were addressed, plaintiff contends that defendant has failed to satisfy his burden of proving suppression of the evidence is required. Plaintiff asserts that Judge Russell properly concluded, when considering the totality of the circumstances, that plaintiff made a sufficient showing of necessity for the wiretap of TT1. Plaintiff points out that it did not have to exhaust all conceivable investigative procedures before resorting to wiretapping. It contends that it gave a full and complete statement explaining the techniques used and those unlikely to succeed if tried.

Lastly, plaintiff declines to particularly address the other wiretaps mentioned by defendant. Plaintiff states that defendant "has not identified any basis to

challenge the remaining wiretaps." Doc. no. 447, p. 1 n. 1. Further, it states that defendant "provides no arguments specific to those wiretaps, which are supported by separate affidavits." *Id*. Plaintiff argues that the court should not consider any arguments apart from defendant's claim that TT1 should be suppressed.

As discussed below, the court concludes that defendant has failed to carry his burden to establish that the Title III wiretap on TT1 was not necessary and defendant's motion to suppress should be denied.[2] The court therefore need not address plaintiff's alternative arguments of implied consent and the scope of Title III.

### III.

Title III contains a "necessity" requirement which must be satisfied before a wiretap order may be lawfully issued. United States v. Castillo-Garcia, 117 F.3d 1179, 1185 (10th Cir. 1997), *overruled on other grounds*, United States v. Ramirez-Encarnacion, 291 F.3d 1219 (10th Cir. 2002) (en banc n. 1). The purpose of the "necessity" requirement is "to ensure that the relatively intrusive device of wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Id*. (quotations omitted). A wiretap is necessary only where "'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *Id*. (quoting 18 U.S.C. §§ 2518 (1)(c), 2518 (3)(c)). "'Normal' investigative procedures include standard visual and aural surveillance, questioning witnesses and participants in the crime (including through the use of grand juries), search warrants, and infiltration of criminal enterprises by undercover agents or confidential

---

[2] The court declines to address the validity of any wiretap other than the one on TT1. The court agrees with plaintiff that defendant has not identified any basis to challenge any of the other wiretaps. There is no indication in the record that defendant was a party to any of the communications intercepted by those wiretaps. *See*, Faulkner, 439 F.3d at 1223.

4

informants." United States v. Zapata, 546 F.3d 1179, 1185 (10th Cir. 2008) (citing United States v. Killingsworth, 117 F.3d 1159, 1163 (10th Cir. 1997)).

A "court's wiretap authorization 'is presumed proper, and the defendant bears the burden of overcoming this presumption.'" United States v. Green, 175 F.3d 822, 828 (10th Cir. 1999) (quoting Killingsworth, 117 F.3d at 1163). If a defendant carries his burden by demonstrating that that a wiretap was not necessary, the evidence obtained by the wiretap will be suppressed. United States v. Foy, 641 F.3d 455, 464 (10th Cir. 2011).

In the court's view, defendant has not carried the required burden. The court opines that the government's application for the Title III wiretap demonstrated sufficient necessity to justify it.

The FBI special agent explained in his affidavit that the underlying investigation targeted the drug trafficking organization ("DTO") run by the Southside Locos Gang ("SSLG"). The DTO was involved in the trafficking of significant quantities of methamphetamine and heroin. The SSLG coordinated the drug trafficking from inside prison. Incarcerated gang members used contraband cell phones to coordinate deliveries between outside sources of supply and couriers working on behalf of the members.

According to the agent, the "ultimate goal of this investigation [was] to identify all persons involved in this illegal activity and gather evidence sufficient to successfully prosecute each of these individuals, particularly any source(s) of supply of methamphetamine or heroin used by the SSLG DTO, as well as identifying other high-ranking members of the SSLG and their subordinates who [were] involved in drug trafficking." Doc. no. 447, Ex. 1, ECF p. 51. The agent explained the investigative techniques that had been tried. He also explained how those techniques were ineffective or dangerous.

5

Specifically, with respect to confidential informants, the agent stated that three cooperating defendants and one confidential source had been used. The three cooperating defendants (CD1, CD2 and CD3) were drug and money couriers for Mr. Dominquez, an incarcerated SSLG member presiding over the DTO. The confidential source (CS1) conducted controlled purchases arranged by Zachary Crister, an incarcerated SSLG member. While CD1, CD2 and CD3 provided valuable information about the overall structure and methods of operation of the SSLG, the identity of some members of the SSLG DTO and information about Mr. Dominquez's drug trafficking, they could not provide information about the current operation within the SSLG DTO or any information as to sources of supply. Although CS1 provided information about Mr. Crister, CS1 lacked knowledge about Mr. Dominquez and the overall structure of the SSLG DTO. The agent also averred that even though it was possible that additional informants would be developed, it was improbable that any new informants developed would be able to provide significant information regarding the activities of all members of the criminal conspiracy, particularly, Mr. Dominquez or the remaining high-ranking SSLG members, who, in addition to Mr. Dominquez, might be sourcing methamphetamine from unidentified individuals. The agent explained that the risk of potential harm to anyone cooperating against a dangerous prison gang was a real concern and that Mr. Dominquez, Mr. Crister and their associated couriers were cautious in conducting illegal activities.

With respect to undercover officers, the agent stated that one undercover officer had been used and had been in contact with Mr. Crister regarding money owed for a controlled buy. Through the undercover officer, a low-level member of the SSLG had been identified, but there was no indication the member was working for Mr. Dominquez. The agent explained that it was unlikely the undercover officer could make it past the initial stages of involvement "without the bona fides of

incarceration in the Oklahoma Department of Corrections." Doc. no. 447, Ex. 1, ECF p. 56. He also explained that the infiltration would likely place the undercover officer in extraordinary danger given the organization's history of violence and that the infiltration would be insufficient to grasp the full scope of the organization's activities because of separate teams operating independently of each other outside of prison.

With respect to physical surveillance, the agent averred that physical surveillance of major targets, including Mr. Dominquez and Mr. Crister, was of limited to no value because they were incarcerated. The agent averred that physical surveillance of other individuals had been conducted, but had not been useful in confirming meetings between individuals and the context of those meetings. In addition, the agent averred that SSLG DTO appeared to be "surveillance conscious," with couriers only appearing at public locations and the locations only being disclosed shortly before the meetings took place. Doc. no. 447-1, ECF, p. 58. The agent further averred that GPS trackers had been placed on several vehicles but that those trackers had only been minimally useful. One tracker had been discovered and the organization changed from using couriers who had had trackers placed on their vehicles.

With respect to search warrants, the agent explained that one search warrant had been executed on a stash house which was useful in confirming the scope of the organization's activities and volume of drugs it delivered. However, the agent explained that any additional search warrant would be premature because law enforcement had not yet positively linked any additional residence to the DTO's drug trafficking activities. In addition, the information that was gained from the one search warrant did not provide significant information about Mr. Dominquez or other high-ranking SSLG members.

With respect to financial investigation, the agent stated that searches of financial databases and queries of information in the banking industry had yielded preliminary information, but that investigators had been unable to successfully investigate the financial component of the criminal activity of Mr. Dominquez, since he was in prison and appeared to use non-incarcerated third parties to conduct his financial business.  Moreover, the organization relied heavily on anonymized transactions such as those provided by Green Dot and PayPal.

With respect to pen register/toll records, the agent averred that pen registers or toll records had been obtained on two contraband telephones, including TT1.  However, the agent averred that the effectiveness of the toll records and pen registers was inherently limited.  The agent explained that these investigative tools could not identify the parties to the conversations or the nature or substance of the conversations to allow law enforcement to differentiate between legitimate calls and calls for criminal purposes.

With respect to garbage seizures, the agent stated that a trash pull was considered at the residence of Stephanie Soliz, Mr. Dominquez's wife, but was ultimately rejected because of extensive outdoor surveillance.  Trash pulls at two other SSLG members' residences were considered, but rejected, because they lived on busy streets, increasing the odds of detection.  Another SSLG member lived in an apartment with a communal trash collection, making it impossible to tie a specific piece of evidence to him.  Further, trash pulls for Mr. Dominquez and Mr. Crister were not possible because they were incarcerated.

With respect to grand jury, the agent averred that a grand jury would be unsuccessful in achieving law enforcement goals because (1) the targets of the investigation, their co-conspirators and other participants would most likely be uncooperative and invoke their Fifth Amendment privilege not to testify; (2) it would be unwise to grant any kind of immunity because it might foreclose prosecution of

8

the most culpable members; (3) there was no guarantee that immunized witnesses would provide truthful testimony; and (4) many of the targets were Hispanic and issuance of grand jury subpoenas might cause them to flee.

With respect to arrests, the agent stated that the use of arrest warrants would be counterproductive in identifying the total scope of the SSLG DTO's operation. The agent explained that the arrests would potentially alert other members of the conspiracy, causing them to alter their behavior and practices, and it was highly unlikely those arrested would cooperate due to fear of retaliation. Further, arresting those members in prison would do little to curb any criminal activity since they were already conducting their illegal activities from prison.

With respect to testimonial cooperation of principals, the agent averred that Mr. Dominquez and Ms. Soliz had previously been arrested and had not cooperated with law enforcement. The agent also explained that the criminals who agree to cooperate frequently do so in a limited capacity. According to the agent, the criminals refrain from providing all the information they possess, particularly regarding sources of controlled substances, and in many instances, they warn co-conspirators of the investigation, thereby compromising it. The agent further explained that based on his experience, most targets will not cooperate for fear of retaliation and they will minimize their role in illicit activities.

With respect to prior interceptions, the agent averred that multiple orders had previously been obtained for the interception of communications of phones and that Mr. Dominquez's communications had been intercepted on one particular phone. However, that investigation was not targeting the SSLG DTO and the interception did not reveal sources of supply directly related to Mr. Dominquez and did not reveal the full expanse of his operation.

With respect to seizure of target device, the agent explained that law enforcement had contemplated the seizure of TT1 but had rejected that as premature.

According to the agent, it was apparent that the SSLG members had no difficulty obtaining cellular phones in prison.  Mr. Dominquez had used at least two cellular phones during the investigation.  According to the agent, if law enforcement were to seize the phone, the DTO would quickly be back in operation.

The court concludes that the FBI special agent, in his affidavit, gave "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  In reaching its conclusion, the court is mindful that government agents are not required to "'exhaust all other conceivable investigative procedures before resorting to wiretapping.'"  United States v. Barajas, 710 F.3d 1102, 1107 (10th Cir. 2013) (quoting Zapata, 546 F.3d at 1186).  Further, the court is satisfied that the wiretap of TT1 was necessary to the law enforcement goal of uncovering the size and scope of the charged conspiracy.  See, Foy, 641 F.3d at 465 (the law enforcement goal of uncovering the size and scope of the conspiracy may justify the authorization of a wiretap).  Thus, the court concludes that the government satisfied the "necessity" requirement and the evidence derived from the wiretap of TT1 need not be suppressed.

IV.

Accordingly, the Motion to Suppress Evidence Obtained from Wiretap on TT 1 (and any Other Wiretap on Which Defendant was Intercepted), filed by defendant, Mario Jaques (doc. no. 418), is **DENIED**.

IT IS SO ORDERED this 11th day of December, 2020.

                                                                                         _SP Friot_
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

19-0372p067 (Jaques).docx