## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No. CR-19-372-F |
| | ) | |
| MARIO JAQUES, | ) | |
| a/k/a Menace Deuce, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the court is the Motion to Suppress Evidence Seized in Searches of Residence filed by defendant, Mario Jaques.  Doc. no. 417.  Plaintiff, United States of America, opposes the motion.  Doc. no. 448.  An evidentiary hearing was held on the motion on November 6, 2020.  As directed by the court, plaintiff filed a supplemental brief and defendant filed a reply brief.  Doc. nos. 475 and 496.  The court has carefully reviewed the parties' submissions and considered the evidence in the record.  Although the matter is not entirely free from doubt, the court concludes that defendant's motion should be denied.

I.

On December 4, 2019, the federal grand jury returned an 81-count indictment against defendant and 23 other individuals.  Defendant was charged in three counts.  Specifically, he was charged with drug conspiracy in violation of 21 U.S.C. § 846 (Count 1), distribution of methamphetamine in violation of 21 U.S.C. § 841(a)(1) (Count 2) and possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (Count 47).  That same day, a federal search and seizure

warrant was issued to search 1125 SW 61st Street in Oklahoma City and seize defendant.  In the early morning of December 5, 2019, a special agent of the Federal Bureau of Investigation and several officers from the Hefner IMPACT Unit of the Oklahoma City Police Department ("OCPD") executed the warrant.  After defendant was handed over to the arrest team, OCPD officers conducted a protective sweep of the house.  A silver pistol was purportedly viewed on top of the refrigerator. Defendant is a convicted felon and prohibited from possessing a firearm.  Shortly thereafter, a state search warrant was obtained by one of the OCPD officers to search for firearms, ammunition, cleaning supplies for firearms, holsters, documents related to the sale or transfer of firearms and articles of personal property tending to establish the identity of persons in control or possession of the residence.  On execution of the state search warrant, OCPD officers found the silver pistol, another pistol, marijuana, methamphetamine, cocaine, heroin, a digital scale, U.S currency totaling $2,415.00 and items of dominion and control for defendant and Asia Ramírez.  Defendant moves to suppress all evidence obtained by way of execution of the state search warrant.  Defendant contends that the silver pistol was not in plain view, the protective sweep was not necessary and appropriate under the circumstances, and the search exceeded the scope of the warrant.

At the evidentiary hearing, defendant presented testimony of two witnesses. Defendant's first witness was Asia Ramirez.  Ms. Ramirez lives with defendant and their two sons at 1125 SW 61st Street.  Ms. Ramirez and defendant have been together for about 10 years.  On December 5, 2019, when the search occurred, the two sons would have been 6 and 7 years old.

The police arrived at the residence of Ms. Ramirez and defendant at or a little after 6:00 a.m. on December 5th.  The defendant was arrested shortly after the police arrived at the house.  By Ms. Ramirez's account, everyone was out of the house within five minutes after the police entered the house.  At first, Ms. Ramirez was

seated on the porch of the house with her two boys.  After that, she was allowed to reenter the house and sat on the living room couch.  At some point between 6:40 a.m. and 7:00 a.m., Ms. Ramirez's mother arrived at the house.

Asia Ramirez testified that she typically kept either a bucket of candy or a basket of potatoes, or both, on top of the refrigerator and that these items would have kept the gun out of sight on top of the refrigerator.  The bucket of candy was kept on top of the refrigerator so that Ms. Ramirez's two sons could not reach it, and the basket of potatoes was kept on top of the refrigerator because of a lack of counter space.  Although her testimony as to her usual practice of keeping the bucket of candy and the basket of potatoes on top of the refrigerator was fairly unequivocal, it was nonetheless couched in terms of what she usually did.  On cross examination by the government, she stopped short of testifying definitively that, on the day in question, the bucket of candy and the basket of potatoes were where she recalled they were typically located on top of the refrigerator.

Ms. Ramirez and her two boys were removed from the house by two officers. They were on the porch for five or ten minutes.  When Ms. Ramirez went back into the house, she could not see, from the living room couch where she was seated, anything indicating that the contents of the house had been disturbed as would have been the case if the house had been searched.

Asia Ramirez was finally able to reenter the kitchen at mid-morning.  She testified that when she reentered the kitchen, the potato basket was "on the fridge, if I remember."  Left unexplained is any reason that Ms. Ramirez would have noticed (or would have had any reason to notice, or, for that matter, to remember) that the potato basket was located where, by her account, it normally sat.

Defendant's second witness was Delilah Ramirez, mother of Asia Ramirez. On December 5th, Delilah Ramirez drove to the residence on SW 61st Street.  Police were there when she arrived.  She saw two officers at the door.  Other officers were

in the house.  She was told to sit on the living room couch.  She was there for 30 or 45 minutes.

Plaintiff presented one witness, Lieutenant Daniel Kleehammer.  He and fellow officers of the Hefner IMPACT Unit assisted in the execution of the federal arrest warrant on the day of the search.  Lt. Kleehammer and the officers arrived at defendant's residence shortly after 6 a.m.  They knocked and announced their presence and that they were there pursuant to a warrant.  Nobody came to the door.  Consequently, they breached the front door.  In breaching the front door, the bolt of the dead bolt lock broke through the trim on the door casing as the door was forcibly opened.

Lt. Kleehammer entered the residence immediately after the door was breached.  Defendant appeared at the top of the staircase.  The staircase, which essentially divided the house into a right half and a left half, was located approximately in front of the door.  As described by Lt. Kleehammer, defendant "verbally engaged" with the officers for about 10 to 15 seconds as he stood at the top of the stairs.  As he stood there, he was also talking to someone else in the house.  That would have been Asia Ramirez.  At the time, Lt. Kleehammer did not know who the other person or persons were.

Defendant came down the stairs about 45 seconds to 1 ½ minutes after the door was breached.  Defendant hesitated as he came down the stairs.  At that point, officers went up the stairs, grabbed him and then passed him to the arrest team.  Defendant was taken to a squad car parked in the street.   At that point, Lt. Kleehammer still could not have known with any certainty how many other people were in the house, or who they were or what their intentions might have been.

Immediately after defendant was secured, officers performed a protective sweep of the house.  By Lt. Kleehammer's account, the officers, including himself, considered it necessary to remain in the house to re-secure the house and to allow

defendant to get any necessary belongings.  There was no testimony indicating that defendant in fact requested to retrieve any belongings or that he did in fact retrieve any belongings.

During the protective sweep, Lt. Kleehammer went left of the staircase and proceeded into the kitchen to clear that room for people.  He did that with the assistance of Sergeant Jehle.  Lt. Kleehammer entered the kitchen for the purpose of determining whether anyone else was in that room who might pose a threat to officer safety.  He did not open any drawers or otherwise conduct a search in the conventional sense.  He also went into the laundry room located right off the kitchen as well as into an "add-on" room and the garage.  By Lt. Kleehammer's estimate, the elapsed time from entry into the house to completion of the protective sweep was about 1 to 1 ½ minutes.

As Lt. Kleehammer walked back through the kitchen from the laundry room to exit the residence, he saw a silver pistol lying on top of the refrigerator.  The silver pistol is shown in government's exhibit 5, which shows what Lt. Kleehammer testified he saw.  Lying on top of the refrigerator, the silver pistol would have been at approximately eye level to Lt. Kleehammer.  As is discussed below, the court credits Lt. Kleehammer's testimony that the gun was in plain view.

Lt. Kleehammer immediately reported the presence of the pistol to the other officers.  He was aware defendant was a convicted felon and prohibited from possessing a firearm.  At that point, the officers "locked the house down" in preparation for the process of seeking a state search warrant.

Lt. Kleehammer told Master Sergeant Russell Mock about the gun and then Lt. Kleehammer left the residence to go to another location unrelated to the present motion.  Sgt. Mock prepared the affidavit for a search warrant (government's exhibit 2).

After the state search warrant was issued, Lt. Kleehammer returned to defendant's residence.  On the search team, Lt. Kleehammer was the "searcher." And another officer served as the "logger."  Upon entering the house to execute the search warrant, Lt. Kleehammer went to the kitchen to get the gun.  The gun was a Smith and Wesson revolver.  The serial number on the gun had been obliterated.  Lt. Kleehammer then went to the kitchen cabinet and drawers.  At or near the north wall of the kitchen was a small blue bucket with $1,515.00 in cash in it, plus some heroin residue.  The search also produced some marijuana and 205 grams of cocaine in a heat-sealed baggie.

The search also produced, elsewhere in the house, 91 grams of marijuana and 32 grams of methamphetamine.

The search also produced a stolen 45 caliber pistol in a cabinet at the top of the stairs.  In that location, the 45-caliber pistol would have been within easy reach of the defendant as he stood at the top of the stairs after the front door was breached.

In the bedroom, the search produced 5.9 grams of heroin and $900 in cash.

As the officers performed their protective sweep to "clear the house" of other persons, they knew that defendant had not been alone in the house because he had been shouting to another person or persons as he stood at the top of the stairs.  While Lt. Kleehammer went left of the staircase to conduct the protective sweep, other officers went right of the staircase and other officers went up the staircase.  Ms. Ramirez and her children were found on the second floor.  They were escorted outside to the porch and then brought back into the living room once the residence was secured.

The search of the residence also recovered numerous items of dominion and control indicating that the house was in fact defendant's residence.

On cross examination, it was clearly established that defendant was removed from the house before the officers began the protective sweep.  Defendant was seated

6

in the squad car within a minute to 1 ½ minutes after the officers entered the house. Thus, the arrest authorized by the warrant had been accomplished before the protective sweep began.

## II.

Having heard the testimony presented by defendant and plaintiff, the court finds that the silver pistol was in plain view. The court finds Lt. Kleehammer's testimony to be more credible than the general recollection of Asia Ramirez. Indeed, the testimony of Lt. Kleehammer is supported by photographic evidence (government's exhibit 5).

## III.

Next, the court concludes that the protective sweep conducted by Lt. Kleehammer did not violate defendant's Fourth Amendment right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV.

In Maryland v. Buie, 494 U.S. 325 (1990), the Supreme Court identified two situations where protective sweeps are permissible. First, authorities are entitled to search "closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id*. at 334. Second, authorities may search elsewhere in the house upon specific, articulable facts supporting a reasonable belief that someone dangerous remains in the house. *Id*. The protective sweep is limited to a "cursory visual inspection of those places in which a person might be hiding." *Id*. at 327. Obviously, a "reasonable belief" is an understanding of a state of facts falling short of certainty.

In its supplemental brief, plaintiff argues that the protective sweep conducted by Lt. Kleehammer fell within both situations recognized by Buie. The record reflects that by the time Lt. Kleehammer began the protective sweep, defendant had been handed off to the arrest team and was outside of the residence. The Tenth Circuit has indicated that under such circumstances, Buie would not justify the

protective sweep. *See*, United States v. Bagley, 877 F.3d 1151, 1154 (10th Cir. 2017) (if defendant was outside the house, a protective sweep cannot be justified as Buie's first type of warrantless search) (citing United States v. White, 748 F.3d 507, 510 (3d. Cir. 2014)).

Although the record does not support a protective sweep under Buie's first situation, it does, in the court's view, support one under the second. Lt. Kleehammer could search beyond adjacent areas upon "'specific and articulable facts'" supporting an objective belief that someone dangerous remains in the house.'" Bagley, 877 F.3d at 1156 (quoting Buie, 494 U.S. at 332, quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)). Prior to descending the staircase as commanded by the officers, Lt. Kleehammer heard defendant talking to someone else. He did not know who the other person or persons were. Once defendant came down the stairs and was handed off to the arrest team, Lt. Kleehammer, along with other officers, immediately began the protective sweep of the residence. Lt. Kleehammer made only a visual inspection of the rooms he entered. No drawers were opened.

Lt. Kleehammer did not see Asia Ramirez or her children escorted from the second floor and outside of the residence by other officers until after he finished his protective sweep. This circumstance distinguishes the case from United States v. Bagley, which is primarily relied upon by defendant, where deputy marshals conducted a protective sweep of a bedroom when the arrestee, his girlfriend and her children had already left the house. The court concludes that Lt. Kleehammer's knowledge of at least one other unidentified person present in the residence was "precisely the sort of specific, articulable information" that would permit the protective sweep. United States v. Nelson, 868 F.3d 885, 890 (10th Cir. 2017); *see also*, United States v. Hauk, 412 F.3d 1179, 1192 (10th Cir. 2005) (concluding that police "had a reason to suspect that there was an unidentified person lurking somewhere in the house" because while police were waiting outside house, third

party drove up and appeared to enter house); United States v. Cavely, 318 F.3d 987, 994 (10th Cir. 2003) ("When [arresting officers] asked if anyone else was in the house, [arrestee] told them he had 'a friend' inside the house, but the friend did not appear or answer when officers knocked on door."). Additionally, Lt. Kleehammer knew defendant was being arrested on drug charges, which "would put any reasonably prudent police officer, executing an arrest warrant for a drug offense . . , on his guard." Hauk, 412 F.3d at 1192. Lt. Kleehammer further knew that defendant had a prior criminal history involving firearms and a "past suggestive of violence." Doc. no. 475-1, p. 101, ll. 6-10. Under the circumstances, the court concludes that the "officers had a compelling interest in assuring themselves that the house was not harboring other persons who posed a danger to them." Cavely, 318 F.3d at 996.

Lastly, even though the protective sweep had ended when Lt. Kleehammer observed the silver pistol, the court concludes that Lt. Kleehammer's presence in the kitchen at that time was lawful because he was exiting the residence through the kitchen after the constitutionally permissible protective sweep. He was not required to have blinders on as he proceeded toward the front door.

IV.

The court further finds the drugs and drug-related items were properly seized under the plain view exception to a warrant requirement. Under the plain view doctrine, officers are entitled to seize evidence found in plain view so long as three prongs are satisfied: (1) the officer is lawfully in position to view the object in plain view; (2) the incriminating nature of the object must be immediately apparent; and (3) the officer had a lawful right of access to the object. United States v. Soussi, 29 F.3d 565, 570 (10th Cir. 1994). Here, Lt. Kleehammer was lawfully in a position to view the drugs and drug-related items because he was searching the residence pursuant to the search warrant pertaining to firearms. The search warrant "provide[d] authority to open closets, chests, drawers, and containers in which the

weapon might be found." <u>United States v. Ross</u>, 456 U.S. 798, 822 (1982).  In addition, the evidence seized was in plain view to Lt. Kleehammer while executing the search warrant.  And, the incriminating nature of the drugs and drug-related items were immediately apparent to Lt. Kleehammer based upon his training and experience.

V.

Accordingly, the Motion to Suppress Evidence Seized in Searches of Residence, filed by defendant, Mario Jaques (doc. no. 417), is **DENIED**.

IT IS SO ORDERED this 11th day of December, 2020.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

19-0372p069 (Jaques).docx