# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No. CR-19-372-F |
| | ) | |
| MARIO JAQUES, | ) | |
| and | ) | |
| JACKIE KNIGHT, | ) | |
| | ) | |
| Defendants. | ) | |

## JAMES HEARING FINDINGS

The court held a <u>James</u> hearing in this case on May 25, 2021.  The purpose of the hearing was to facilitate the court's determinations, under Rule 801(d)(2)(E), F.R.Evid., of the admissibility of out-of-court statements against the defendants Mario Jaques and Jackie Knight.   Having carefully considered the evidence presented at the <u>James</u> hearing, the court now makes its findings.

I.
<u>The Showing Required under Rule 801(d)(2)(E)</u>

Under Rule 801(d)(2)(E), F.R.Evid., co-conspirators' statements that would otherwise be hearsay may be introduced into evidence against a defendant co-conspirator if they were made "during and in furtherance of the conspiracy." <u>United States v. Morgan</u>, 748 F.3d 1024, 1036 (10th Cir. 2014), *cert. denied sub nom.* <u>Ford v. U.S.</u>, 574 U.S. 915 (2014).  Consequently, before admitting co-conspirators' statements, the court must determine, by a preponderance of the evidence, (1) that a conspiracy existed, (2) that the declarant and the defendant were both members of

the conspiracy, and (3) that the statements were made in the course of and in furtherance of the conspiracy. *Id.  See also*, United States v. Owens, 70 F.3d 1118, 1123 (10th Cir. 1995), *cert. denied*, 525 U.S. 883 (1998).

As to the third prong, it is not always necessary, or even desirable, to make a pretrial determination as to every statement that might potentially be admitted under Rule 801(d)(2)(E).  *See,* United States v. Alcorta, 853 F.3d 1123, 1138 (10th Cir. 2017), where the Court of Appeals noted (without criticism) that the district court "provisionally admitted most of the calls offered under the coconspirator exception, subject to the government's connecting those statements to the conspiracy during trial."

As directed by the court, the government has filed a compendium of the statements it may seek to admit under the rule.  The court refers specifically to some of those statements in this order.  As to those statements, the court does find that each statement was made in the course of and in furtherance of the conspiracy.  That leaves for determination at trial the question of whether the third prong is satisfied as to the other statements in the compendium (and, obviously, as to any statements that may hereafter be discovered by the government, for instance, during final trial preparation).

In determining whether the prerequisites for admission have been satisfied, the court may consider the co-conspirator's statements that are sought to be admitted. Bourjaily v. United States, 483 U.S. 171, 181 (1987); United States v. Lopez-Gutierrez, 83 F.3d 1235, 1242 (10th Cir. 1996); Owens, 70 F.3d at 1125. Under Bourjaily, there need, at most, be "some independent evidence linking the defendant to the conspiracy." United States v. Martinez, 825 F.2d 1451, 1453 (10th Cir. 1987), *cert. denied*, 494 U.S. 1059 (1990).  That "independent evidence may be sufficient even when it is not 'substantial.'" Lopez-Gutierrez, 83 F.3d at 1242. "Independent evidence," in this context, is not rendered inadmissible by the fact that

it comes from some other member of the conspiracy or by the fact that the statement was made to a government agent. <u>Owens</u>, 70 F.3d at 1125. To the contrary, "independent evidence" is simply "evidence other than the proffered [co-conspirator] statements themselves." *Id.* In determining whether the government has carried its burden under Rule 801(d)(2)(E), the court has the discretion to consider any evidence not subject to a privilege, regardless of whether that evidence would be admissible at trial. <u>Owens</u> at1124. A statement made by a co-conspirator is admissible against a defendant who subsequently joins the conspiracy. <u>United States v. Brown</u>, 943 F.2d 1246, 1255 (10th Cir. 1991). Thus, the fact that a defendant may have joined the conspiracy after its inception does not make his co-conspirators' previous statements inadmissible. *Id. See also*, <u>United States v. Dial</u>, 757 F.2d 163, at 170-71 (7th Cir. 1985), *cert. denied*, 474 U.S. 838 (1985).

II.

<u>The Showing Required under 21 U.S.C. § 846</u>

The court's determinations under Rule 801 are, of course, guided by the law of conspiracy as made applicable to drug cases prosecuted under 21 U.S.C. § 846. Aside from any issues as to drug quantity (not relevant for present purposes), the government's burden, in a drug conspiracy case under 21 U.S.C. § 846, is to prove:[1]

First: two or more persons agreed to violate the federal drug laws;

Second: the defendant knew the essential objective of the conspiracy;

Third: the defendant knowingly and voluntarily involved himself in the conspiracy; and

Fourth: there was interdependence among the members of the conspiracy.

As is also made clear by the Tenth Circuit's pattern instruction:

---

[1] As to this discussion of conspiracy law, see Tenth Circuit Pattern Jury Instruction 2.87.

- An explicit agreement among the conspirators is not required, but the evidence must show that the members of the conspiracy "came to a mutual understanding to try to accomplish a common and unlawful plan."  A defendant becomes a member of a conspiracy by knowing at least the essential goals of the conspiracy and voluntarily choosing to be a part of it.

- The defendant does not have to be shown to have known all of the other members of the conspiracy or to have known all of the details of how the conspiracy was to be carried out.

- There must be interdependence among the conspirators, but this requires no more than a showing (i) that the "members intended to act for their shared mutual benefit," and (ii) that the defendant's "actions constituted an essential and integral step toward the realization of" the purpose of the conspiracy.

- As long as the elements of a conspiracy are shown, it does not matter that a defendant participated in the conspiracy for only a brief time, or that he was only a bit player.  But if the defendant's only connection with the conspiracy was that he knew about it, or if he merely had some loose association with the actual participants in the conspiracy, he is not a conspirator.  The evidence must show that "the defendant knowingly joined the conspiracy with the intent to advance its purposes."

At the James hearing, the court expressed concern as to whether the defendant Mario Jaques' activities, as shown by the evidence, were so few and far between, so sporadic, as to raise a doubt as to whether he was really a member of the charged conspiracy.  On this point, the government gets the combined benefit of the relatively low evidentiary bar (Part I, above) and the relatively inclusive reach of conspiracy law, encompassing, as it does, even bit players as long as they had the required knowledge and intent.

III.

Findings

The government's evidence at the <u>James</u> hearing consisted of the compendium filed as required by the court, and the testimony of F.B.I. Special Agent Marisol Flores.  Agent Flores testified essentially as a summary witness, describing the nature and scope of the investigation (and the conspiracy), providing an overview of the results of the investigation and, at a more granular level, particulars as to the activities of Jaques and Knight in the conspiracy.  Agent Flores' in-depth knowledge of the facts of this case was obvious.  Equally obvious was her candor and her unwillingness to guess or speculate.  In a word, she was credible.  Her testimony easily suffices to provide the "independent evidence" (*i.e.* independent of the conspirators' statements) discussed in <u>Bourjaily</u>.

<u>Jaques</u>.

The government did not offer (and apparently does not have) intercepted communications directly involving Jaques.  Consequently, the <u>James</u> hearing evidence as to Jaques is as sparse as the evidence as to Knight is abundant.  Although sparse, the evidence as to Jaques is sufficient when evaluated under the standards set forth above.

As to Jaques, the court finds:[2]

A drug distribution conspiracy existed as alleged by the government in the Superseding Indictment (doc. no. 646).  The conspiracy began as early as October 31, 2018 and continued until early December, 2019.  Jaques' role, as a conspirator who was on the street (rather than being incarcerated), was to facilitate drug transactions by picking up drugs, delivering them as required and turning in the

---

[2] All of the findings in this order are made on the basis of a preponderance of the evidence.

proceeds.  On October 31, 2018, Jaques knowingly participated in an illegal drug distribution transaction by supplying the ounce of methamphetamine required to complete a controlled buy which was initiated by a confidential informant (as the purchaser) and coordinated by Zachary Crister, who was incarcerated at the Oklahoma State Penitentiary.  Jaques showed up with the right amount of methamphetamine at the right place, all consistent with the content of the relevant intercepted communications (involving other participants).  (After the transaction was completed, the ounce of methamphetamine was recovered.)  Jaques was a member of the conspiracy at least as early as this date, October 31, 2018.  Jaques was a Southside Locos gang member, as was Crister.  Since Crister was incarcerated, he looked to Jaques to deliver drugs as needed.  This exemplifies interdependence.

On May 7, 2019, in a surveilled transaction, Jaques assisted in replacing a significant quantity of methamphetamine that had been found to be of poor quality. Jaques met with Sharlene Cash to provide the replacement (good quality) methamphetamine.

As for the elements of a § 846 drug conspiracy, the court finds that Jaques knowingly agreed to violate federal drug laws, was well aware of the essential objective of the conspiracy and knowingly and voluntarily involved himself in the conspiracy.  His participation vividly illustrated the required interdependence. Without Jaques and others like him, the incarcerated Southside Locos gang members could not have run the drug trafficking operation from behind the walls of the state penitentiary.  To be sure, the evidence as to Jaques is not nearly as compelling as the evidence as to Knight.  But the government is not required to make a compelling showing.

Knight.

For present purposes, intercepted communications (telephone conversations and text messages, augmented by the "independent evidence" provided by the

6

testimony of Agent Flores) tell the court what it needs to know as to Knight. Although Knight was not a high-level player in this drug trafficking organization, his role, like that of Jaques, was essential.

Knight's overall participation in the conspiracy can best be understood when assessed in light of specific activities, on specific dates, as disclosed by intercepted communications.  The intercepted communications clearly establish that Knight worked closely with Ramon Dominquez, who was incarcerated at all times relevant to this order.  Typically, Dominquez would coordinate with Knight (via telephone calls and text messages) to facilitate the completion of drug transactions, including the collection of proceeds of drug sales.

Dominquez had remarkable freedom of communication from within the Oklahoma State Penitentiary, as evidenced (by way of example only) by a series of communications between Dominquez and Knight on March 7, 2019.  Late in the afternoon on that day, Dominquez had a telephone conversation with Knight at a preliminary stage of a planned drug transaction.  Dominquez inquires:  "[Y]ou got money to buy a whole half?"  Knight responds:  "Yep."  Government Exhibit 3.5. Following that preliminary telephone conversation, communications ensued by way of text messages.  After communications between Dominquez and John Buckaloo to confirm Buckaloo's role (transportation) in the transaction, Dominquez texted Knight to inform him that the delivery would be made to Knight between 8:30 and 9:00 p.m.  Government Exhibit 3.17.  About three minutes later, Knight texted Dominquez to let Dominquez know what telephone number should be called to inform Knight that the courier (Buckaloo) had arrived at the destination (Lawton, Oklahoma) to deliver the drugs.

At approximately 9:15 p.m. on March 7, Dominquez texted Knight to find out where the delivery should be made.  Ten minutes later, Knight texted Dominquez to let him know that the delivery should be made at the "Dayz inn."  Government

Exhibit 3.24.  Dominquez promptly gave Buckaloo the address where the delivery would be made, Government Exhibit 3.28, as well as the name of the hotel. Government Exhibit 3.29.  At 10:00 p.m., Dominquez called Buckaloo to check on the status of the delivery.  Government Exhibit 3.30.  Sixteen minutes later, Buckaloo inquired of Dominquez, by text:  "Am I picking anything up." Dominquez responded:  "Yes like 29."  Government Exhibit 3.32.  The transaction was completed at about 10:30 p.m.  Shortly after 10:30, Buckaloo texted Dominquez: "It's done I'm counting it."  Government Exhibit 3.33.

At 11:08 p.m. Knight texted Dominquez, complaining that the methamphetamine delivered by Buckaloo was "wet."  Government Exhibit 3.6. Dominquez mollified Knight:  "It's good bro let it dry a lil."  Government Exhibit 3.37.  The intercepts disclose no more communications about the quality problem.

Knight and Dominquez were in touch with each other again on March 19, 2019.  Dominquez called Knight from the Oklahoma State Penitentiary to cover some accounting issues with Knight.  Government Exhibit 5.1.  Dominquez inquired:  "How much of it is your money and how much of it is mine?"  Knight responded:  "two for you and I got sixteen for me."  *Id.*  This conversation concluded with some instructions from Dominquez to Knight about the location (in southwest Oklahoma City) of a delivery to be made that day.  Nearly an hour and a half later, Knight texted Dominquez that he was "Here."  Government Exhibit 5.2.  Five minutes later, Dominquez called Douglas Smart to let Smart know that the transaction would be completed at the "EZ Mart, SW 44th and Independence." Government Exhibit 5.3.  Two minutes later, Dominquez texted Knight, telling Knight to go "to sw 44 independence."  Government Exhibit 5.6.  Less than a minute later, Knight texted Dominquez that he, Knight, would be using the "Same green car."  Government Exhibit 5.8.  Three minutes later, Dominquez, being curious about where Knight was, texted Knight:  "Do you know how far you are?"

Government Exhibit 5.10.  Knight reassured Dominquez:  "Bout to pull up now."
Government Exhibit 5.11.  Five minutes later, Dominquez texted Knight: "Pulling
up in 2 minutes in a purple 300."  Government Exhibit 5.16.  Dominquez cautioned
Knight:  "Make sure your giving 3600 bro."  *Id.*

This meeting, late in the afternoon on the 19th, was surveilled.  The
surveillance observed Knight to meet Sharlene Cash in a purple 300.  She held the
drugs and collected the proceeds for Dominquez and Smart.  Six minutes after the
"purple 300" text, Smart confirmed to Dominquez:  "It's done."  Government
Exhibit 5.20.

At least in a broad sense (and at least on the basis of the evidence now before
the court), Knight's role in the drug trafficking organization did not differ radically
from that of Jaques.  He was a facilitator, acting at the direction (or at least with the
benefit of the coordination) of the incarcerated conspirators.

Knight knowingly agreed to violate federal drug laws, was well aware of the
essential objective of the conspiracy and knowingly and voluntarily involved himself
in the conspiracy.  As is the case with Jaques, Knight's participation vividly
illustrated the required interdependence.

IV.
Conclusion

The first two prongs of the Rule 801(d)(2)(E) inquiry are satisfied as to Jaques
and Knight.

The statements cited in this order were made in the course of and in
furtherance of the conspiracy.  The compendium, doc. no. 647, includes other
statements not specifically addressed in this order.  The court's preliminary review
of those statements leaves the distinct impression, broadly speaking, that they, also,
were made in the course of and in furtherance of the conspiracy.  Individualized

determinations will have to be made, as necessary, at trial.  This order, taking the Rule 801(d)(2)(E) analysis as far as is practicable at this point, serves the important policy interests discussed in detail in <u>United States v. Roberts</u>, 14 F.3d 502, 514 (10th Cir. 1993) and reiterated in subsequent cases.  The vice of inadequate (or nonexistent) attention, well before trial, to the Rule 801 prerequisites to admissibility is that the jury will see or hear prejudicial co-conspirator statements before a reliable determination has been made as to the existence, nature and duration of the conspiracy and the defendant's role (if any) in it.  Indeed, the Court of Appeals has summarized the rationale for holding James hearings by telling us that the purpose of the hearing, quite simply, is to determine "the existence of a predicate conspiracy."  <u>United States v. Urena</u>, 27 F.3d 1487, 1491 (10th Cir. 1994), *cert. denied*, 513 U.S. 977 (1994).  Absent an obvious need, (such as the existence of statements plainly deserving careful attention before trial), the more granular task of assessing individual statements (the third prong under Rule 801) can safely be deferred until trial.

Dated June 2, 2021.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

19-0372p113 James Hrg .docx

10